Filed 6/27/19; Opinion following trransfer from Supreme Court

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E066674 |
| v. | (Super.Ct.No. RIF1506598) |
| BRIAN KEITH KOBACK, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  W. Charles Morgan, Judge.  (Retired Judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part; reversed in part with directions.

Jason L. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Melissa Mandel and Craig H. Russell, Deputy Attorneys General, for Plaintiff and Respondent.

1

INTRODUCTION

Defendant Brian Keith Koback walked into a rental car company office and stole a set of car keys. When confronted by three employees in the parking lot, defendant told the men to back off or he would "fuck" them up. He then walked across the street. Undeterred, the three employees followed defendant to a motel parking lot where they again confronted him and demanded defendant return the keys. Defendant made a tight fist around one of the key fobs, so the ignition portion of the key was sticking out between his knuckles and, from within arm's reach, lunged at one of the employees while swiping or swinging at the employee's torso. Defendant did not make contact. When the employees backed off, defendant jumped a fence and tried to flee. Police officers arrived and pursued defendant. Officers subdued defendant after a brief struggle, during which three of the officers suffered minor injuries.

Defendant was charged with and convicted of robbery, assault with a deadly weapon, and resisting arrest. Defendant admitted he had suffered a strike conviction, and the trial court sentenced him to state prison for 14 years four months. On appeal, defendant argues: (1) his conviction for assault with a deadly weapon is not supported by substantial evidence because there is no evidence he used the car keys in a manner that was capable of inflicting and likely to cause great bodily injury; (2) the trial court abused its discretion by imposing consecutive sentences on the robbery and resisting arrest counts, under the mistaken belief it could only impose concurrent sentences if it struck defendant's strike prior; (3) the minutes of sentencing and abstract of judgment do not

accurately reflect the oral pronouncement of sentence with respect to restitution and parole revocation fines; and (4) the minutes of sentencing contain a clerical error because they state defendant admitted two strike priors instead of one.

In the published portion of our prior opinion, we concluded defendant's conviction for assault with a deadly weapon was supported by substantial evidence. (*People v. Koback* (2018) 25 Cal.App.5th 323, review granted Oct. 24, 2018, S250870.) In the unpublished portion of our prior opinion, we held the trial court erred when it concluded the only way it could impose concurrent sentences on defendant's robbery and resisting arrest convictions was if it first struck defendant's admitted strike prior. We reversed the sentence and remanded for the trial court to resentence defendant and to consider in the first instance whether concurrent sentencing is appropriate in this case. Because we reversed the sentence, we left it to the trial court on remand and the Department of Corrections and Rehabilitation to ensure the minutes and abstract of judgment would accurately reflect whatever sentence the court imposed on remand.

The California Supreme Court granted defendant's petition for review on the issue of the sufficiency of the evidence to support his conviction for assault with a deadly weapon. The Supreme Court subsequently transferred the appeal back to this court with directions to vacate our prior opinion and reconsider the appeal in light of *In re B.M.* (2018) 6 Cal.5th 528 (*B.M.*). (*People v. Koback* (Mar. 27, 2019, S250870) 2019 Cal. Lexis 2046.) We have vacated our prior opinion and received supplemental briefs from the parties addressing the impact of *B.M.* on this case.

3

We once again affirm defendant's conviction for assault with a deadly weapon, reverse the sentence, and again remand for the trial court to resentence defendant and to consider in the first instance whether to impose concurrent sentences on counts 2 and 3.

II.

PROCEDURAL BACKGROUND

In an information, the People charged defendant with assault with a deadly weapon other than a firearm, to wit, a key (Pen. Code, § 245, subd. (a)(1), count 1); robbery (Pen. Code, § 211, count 2); and (3) resisting arrest (Pen. Code, § 69, count 3). The People alleged defendant suffered two prior prison terms (Pen. Code, § 667.5, subd. (b)), to wit: a 2013 conviction for possessing a controlled substance (Health & Saf. Code, § 11377, subd. (a)) and a 2011 conviction for attempted carjacking (Pen. Code, §§ 664, 215). Finally, the People alleged defendant's 2011 conviction for attempted carjacking was a serious felony and a serious and violent felony. (Pen. Code, §§ 667, subds. (a), (c), (e)(1), 1170.12, subd. (c)(1).)

A jury found defendant guilty on all three counts. In a bifurcated proceeding, defendant admitted his 2011 conviction for attempted carjacking was a strike. The trial court sentenced defendant to a total term of 14 years four months in state prison.

Defendant timely appealed.

## III.

## FACTS

On November 6, 2015, defendant walked into a rental car company office, grabbed a set of car keys from the front desk, and walked out.[1] Chase,[2] an employee who was manning the front desk, learned what had happened from a customer and followed defendant into the parking lot. Chase told defendant to stop, and said, "Please give me the keys." Defendant kept walking away, pretended not to know anything about the keys, and reached into the pocket of his sweatpants. Fearing defendant might be armed, Chase backed off and enlisted the help of two other employees who happened to be nearby, Agustin and Arthur. The three employees formed a wide circle around defendant to prevent him from leaving.

Chase and Agustin noticed one of the keys was hanging out of defendant's pocket, and they demanded defendant return the keys. Defendant stopped and stood facing Agustin and Arthur from about two feet away. Chase backed off and stood about five feet behind defendant. Defendant appeared to be getting angry. Defendant again reached into his pocket, "like he was going to go for something." Defendant told the men to "back up" or "move," or he would "fuck" them up. He then began to walk away across

---

[1] The set consisted of two car keys attached to key "fobs," and a tag from the rental car company, on a wire ring.

[2] We refer to the three witnesses by their first names only, and we mean no disrespect in doing so. We point out that the record includes different spellings of the same witnesses, i.e., Agustine/Agustin and Arthur/Arturo. We will use Agustin and Arthur, respectively.

5

the street.  The employees then got into Arthur's car and followed defendant into a motel parking lot across the street.

The three men stood around defendant in the motel parking lot and again demanded that defendant return the car keys.  Chase testified defendant stood "[a]bout a foot from arm's reach" away from the three men, but Agustin was closest to defendant.  Agustin testified defendant stood two to three feet away from him, and was within arm's reach.  Defendant asked, "You want the keys?"  He then took the car keys from his pocket, made a tight fist, and held one of the keys with the "sharp"[3] or ignition end of the key sticking out between his knuckles.  Defendant then "charged," "came at," or "lunged" at Agustin and "swung" or "swiped" the key at Agustin's torso.[4]  Arthur described defendant's motion like "throwing a punch."  Agustin testified he was nervous

---

[3]  In his briefs, defendant describes the ignition end of the key that was protruding from his knuckles as "blunt."  No witness described the end of the key as "blunt," and defendant's characterization of the key ignores the actual testimony in this case.  Chase testified on direct examination defendant held the "[k]ey in between the knuckles."  The prosecutor asked, "So the sharp end of the key was sticking out from between the knuckles?"  Chase answered, "Yes."  Augustin also testified on direct that defendant gripped the key between his fingers, so it was protruding through his knuckles.  The prosecutor asked Augustin, "So the sharp end of the key was protruding out from his hand, right?"  Augustin answered, "Yes."  (See *People v. Margarejo* (2008) 162 Cal.App.4th 102, 107 ["Counsel's questions themselves are not evidence, but the question's wording typically is relevant to a reasonable interpretation of the witness's answer.  Often it is vital to consider the question to understand *anything* about the answer, as with answers like 'yes.'"].)  And, as explained, *post*, we are required to view the evidence *in favor* of the judgment.  (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071.)

[4]  Augustin testified he was wearing a green shirt, with "Enterprise" on it.  Earlier, Chase had testified Arthur and Augustin were wearing green polo shirts provided to the dealership's "[c]ar wash reps."

6

and afraid he might get hurt because defendant swung the key at him "with force." Chase testified he did not believe defendant was close enough to Agustin to actually make contact. But Agustin testified he was not hit "because my nephew [i.e., Arthur] pulled me back." Arthur testified, "If I didn't move [Agustin], he probably would have got hit." The three men backed away from defendant.

Defendant then put the keys back into his pocket, took off, and scaled the wall behind the motel. The employees got back into the car and found defendant as he walked along one of the streets behind the motel. They followed defendant by car through a small area of shops and streets for about 40 minutes, until law enforcement arrived and took over the pursuit. Several deputies chased down and subdued defendant. Defendant resisted, and three deputies were injured in the process.

Defendant testified he found the car keys next to a bus stop. Defendant ran from the police because he feared for his life. He denied taking the car keys from the rental car company office, denied resisting arrest, and denied that he swung the keys at Agustin.

IV.

DISCUSSION

A.  *Substantial Evidence Supports Defendant's Conviction for Assault with a Deadly Weapon.*

Defendant argues his conviction for assault with a deadly weapon is not supported by substantial evidence because he did not use the car keys—an object that is not inherently deadly or dangerous—in a manner capable of causing and likely to result in

7

serious bodily injury. On this record, we conclude defendant did, in fact, use the car keys as a deadly weapon.

### 1. *Standard of review.*

Our standard of review is well settled. "We ""'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'""" (*People v. Brooks* (2017) 3 Cal.5th 1, 57; see *B.M.*, *supra*, 6 Cal.5th at pp. 536, 539.)

"""'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'"""" (*People v. Harris* (2013) 57 Cal.4th 804, 849-850.) "'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

"'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

*2.* *Applicable law.*

"Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm shall be punished by imprisonment in the sate prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment." (Pen. Code, § 245, subd. (a)(1); all undesignated statutory references are to the Penal Code.)

"As used in section 245, subdivision (a)(1), a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury. [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed established their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue." (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029 (*Aguilar*).)

The minor in *B.M.*, *supra*, 6 Cal.5th 528, took a six-inch "butter knife" with small ridges on one edge and made a few downward stabbing motions at her sister's legs. The sister was wearing nothing but a bath towel and, just before the attack, covered herself with a blanket. The knife did not penetrate the blanket or cause any injury, and the sister testified the pressure she felt from the knife was five or six on a scale of one to 10. (*Id*.

9

at p. 531.) The juvenile court sustained an allegation the minor committed an assault with a deadly weapon. (*Id*. at pp. 531-532.) The Court of Appeal affirmed, reasoning, "'[i]t matters not that [the sister] was able to fend off great bodily injury with her blanket' or 'that [B.M.] was not adept at using a knife' because B.M. 'could have easily inflicted great bodily injury with this metal butter knife and just as easily [could] have committed mayhem upon the victim's face.'" (*Id*. at p. 532.) The appellate court expressly disagreed with *In re Brandon T*. (2011) 191 Cal.App.4th 1491, which had held a butter knife with a round end and serrated edge was not used as a deadly weapon when a minor made a slashing motion to the victim's cheek and throat with sufficient force to cause the blade of the butter knife to break, caused welts and scratches to the victim, but did not draw blood. (*Id.* at pp. 1496-1498.)

In *B.M.*, *supra*, 6 Cal.5th 528, the Supreme Court clarified the law with respect to assault with a deadly weapon when the object used is not an inherently deadly weapon and distilled three principles to be applied in such cases:

"First, the object alleged to be a deadly weapon must be used in a manner that is not only 'capable of producing' but also "'*likely to produce* death or great bodily injury.'" (*Aguilar*, *supra*, 16 Cal.4th at p. 1029, italics added.)" (*B.M.*, *supra*, 6 Cal.5th at p. 533.) The court rejected the Attorney General's argument "'capable of producing' and 'likely to produce' are essentially the same because the term "'likel[y]'" has the same meaning as "'possib[le].'"'" (*Ibid*.) Citing dictionaries (see discussion of *B.M.*'s concurring opinion, *post*), the court stated the Attorney General's definition was "at odds with the ordinary meaning of 'likely.'" (*Ibid*.) And citing decisions holding felony child

10

abuse "'likely to produce great bodily harm or death'" (§ 273a) refers to abuse in situations where the probability of serious injury is great, the court indicated the Attorney General's definition "is also inconsistent with how we have treated the term 'likely to produce bodily harm or death' elsewhere in the Penal Code." (*B.M.*, at p. 533.)

The Supreme Court also rejected the Attorney General's assertion an object is likely to produce death or great bodily injury if its use """"in an assault increases the likelihood of great bodily injury."""" (*B.M.*, *supra*, 6 Cal.5th at p. 534.) "[T]he fact that B.M.'s use of a butter knife may have *increased the likelihood* of serious injury does not establish that her use of the object was *likely* to cause serious injury. An increase in likelihood from impossible to unlikely, for example, does not show that the object was likely to cause serious harm. The use of an object in a manner 'likely to produce' death or great bodily injury [citation] requires more than a mere possibility that serious injury could have resulted from the way the object was used." (*Id.* at p. 534.)

"Second, the *Aguilar* standard does not permit conjecture as to how the object could have been used. Rather, the determination of whether an object is a deadly weapon under section 245[, subdivision ](a)(1) must rest on evidence of how the defendant actually 'used' the object." (*B.M.*, *supra*, 6 Cal.5th at p. 534.) "'[E]xcept in those cases involving an inherently deadly weapon[,] the jury's decisionmaking process in an aggravated assault case . . . is functionally identical regardless of whether . . . the defendant employed a weapon alleged to be deadly as used or employed force likely to produce great bodily injury; in either instance, the decision turns on the nature of the force used.'" (*Id*. at p. 535.)

11

Although the Supreme Court held "it is inappropriate to consider how the object could have been used as opposed to how it was actually used," the court made clear "it is appropriate in the deadly weapon inquiry to consider *what harm could have resulted from the way the object was actually used.* Analysis of whether the defendant's manner of using the object was likely to produce death or great bodily injury necessarily calls for an assessment of potential harm in light of the evidence. As noted, a mere possibility of serious injury is not enough. But the evidence may show that serious injury was likely, even if it did not come to pass." (*B.M.*, *supra*, 6 Cal.5th at p. 535, italics added.) The Supreme Court faulted the Court of Appeal for engaging in conjecture by stating B.M. might have committed mayhem on the victim's face. "There is no evidence that B.M. stabbed, sliced, or pointed the butter knife toward or near [her sister's] face, or that B.M. attempted or threatened to do so. Nor is there evidence that B.M. was flailing her hand with the butter knife or otherwise wielding it wildly or uncontrollably. (Cf. *People v. Simons* (1996) 42 Cal.App.4th 1100, 1106 . . . (*Simons*).)" (*Ibid.*; see *id*. at p. 538 [rejecting the Court of Appeal's statement it was through sheer luck the sister was not injured, stating, "the inquiry must focus on the evidence of how B.M. actually used the knife, not on various conjectures as to how she could have used it"].)

"Third, although it is appropriate to consider the injury that could have resulted from the way the object was used," the Supreme Court cautioned "the extent of actual injury or lack of injury is also relevant." (*B.M.*, *supra*, 6 Cal.5th at p. 535.) A conviction for assault with a deadly weapon does not require evidence of actual injury or contact, "but limited injury or lack of injury may suggest that the nature of the object or the way it

12

was used was not capable of producing or likely to produce death or serious harm."
(*Ibid.*)

Applying those three principles, the Supreme Court concluded the evidence did not support a finding B.M. used the butter knife in a manner likely to produce death or great bodily injury. (*B.M.*, *supra*, 6 Cal.5th at pp. 536, 539.) The court stated three circumstances supported its conclusion: "First, the record indicates the six-inch metal knife B.M. used was '[t]he type of knife that you would use to butter a piece of toast'; it was not sharp and had slight ridges on one edge of the blade. (See *Brandon T.*, *supra*, 191 Cal.App.4th at pp. 1496-1498 [butter knife with 'rounded end' was incapable of causing serious injury even when applied to the victim's face with enough force to break the knife]; [*In re*] *D.T.* [(2015)] 237 Cal.App.4th [693,] 701 [contrasting the butter knife in *Brandon T.* with a sharp pocketknife].)" (*B.M.*, at p. 536.) "Second, B.M. used the knife only on [her sister's] legs, which were covered with a blanket. There is no evidence that B.M. used or attempted to use the knife in the area of [her sister's] head, face, or neck, or any exposed part of her body." (*Ibid.*) "[And] [t]hird, the moderate pressure that B.M. applied with the knife was insufficient to pierce the blanket, much less cause serious bodily injury to [her sister]." (*Ibid.*)

The Supreme Court rejected the Attorney General's argument the sister could have been seriously injured had she not defended herself by covering herself with a blanket. "[T]here is no evidence indicating [the sister] pulled the blanket over her legs *after or in reaction to* seeing B.M. begin a slicing or stabbing motion directed at [her] exposed legs. . . . Further, . . . nothing in the record suggests that B.M., who was aware that [her

13

sister's] legs were covered and that the knife was not penetrating the blanket, then used or tried to use the knife on an exposed part of [her sister's] body." (*B.M.*, *supra*, 6 Cal.5th at p. 537, italics added.) Relevant here, the court stated, "To be sure, an aggressor should not receive the benefit of a potential victim fortuitously taking a defensive measure *or being removed from harm's way* once an assault is already underway. But the facts known to the aggressor before the assault, including defensive measures taken by the victim, are relevant to determining whether the aggressor used an object in a manner likely to cause serious injury." (*Ibid.*, italics added.)

The Supreme Court also rejected the Attorney General's argument "that 'an object can be a deadly weapon even if there is no contact or injury, and "'even if it's not actually used with deadly force.'"'" (*B.M.*, *supra*, 6 Cal.5th at p. 538.) The court noted the cases the Attorney General cited "involved a sharp object applied to a vulnerable part of the body (*D.T.*, *supra*, 237 Cal.App.4th at pp. 697, 696 ['"sharp" and "pointy"' pocketknife used to 'poke[]' someone 'multiple times in the upper back' is a deadly weapon]; see *D.T.*, at pp. 699-701; *People v. Page* (2004) 123 Cal.App.4th 1466, 1469 . . . ['"sharp[,] pointy"' pencil held up to someone's neck]) or a sharp object wielded in a wild or uncontrolled manner (*Simons*, *supra*, 42 Cal.App.4th at p. 1106 [the defendant, being chased by police officers, '"flail[ed] his hands . . . [and] would bring [a] screwdriver forward"' when approached]). Here, the knife was not sharp or pointy; it was not applied to any vulnerable part of [the sister's] body; and there is no evidence that B.M. wielded the knife wildly or uncontrollably." (*Id.* at p. 538.)

14

In a separate concurring opinion, Justice Chin (who fully joined the unanimous maj. opn.) clarified the Supreme Court did "not decid[e] the meaning of the word 'likely' in the phrase '"capable of producing and *likely* to produce, death or great bodily injury."'" (*B.M.*, *supra*, 6 Cal.5th at p. 539 (conc. opn. of Chin, J.).) Justice Chin stated the court had only determined "'likely'" "means something 'more than a mere possibility.' (Maj. opn., *ante*, at p. 534; see *id*. at p. 535.)" (*B.M.*, at p. 539 (conc. opn. of Chin, J.).) Although the majority opinion had cited dictionary definitions of the word "'likely'" as meaning ""'having a high probability,'" "'very probable,'" or a """'probability [that is] great,'""'" to disprove the Attorney General's argument "'likely' means 'probable,'" Justice Chin cautioned against reading the majority opinion as having adopted such definitions. (*Ibid*.) "Indeed, such a holding would be inconsistent with the majority's citations to *In re D.T.* (2015) 237 Cal.App.4th 693 . . . , *People v. Page* (2004) 123 Cal.App.4th 1466 . . . , and *People v. Simons* (1996) 42 Cal.App.4th 1100 . . . . (See maj. opn., *ante*, at p. 538.) Those cases all involved the use of a sharp object in a threatening manner, and in all three cases an argument could be made that great bodily injury was not *probable*, but the deadly weapon finding was nonetheless upheld." (*B.M.*, at pp. 539-540 (conc. opn. of Chin, J.).)

Finally, Justice Chin suggested that, when the Supreme Court does squarely address the meaning of "'likely'" for purposes of assault with a deadly weapon, "our resolution of the question [will] call[] for a careful analysis like the one that appears in *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888 . . . , a decision involving the meaning of the word 'likely' in the Sexually Violent Predators Act (Welf. & Inst. Code,

15

§ 6600 et seq.), which refers to persons 'likely to engage in acts of sexual violence' (*id*., § 6601, subd. (d).) That opinion shows that, in the context of a law designed to prevent harm, 'likely' can sometimes mean something less than 'probable.'" (*B.M.*, *supra*, 6 Cal.5th at p. 540 (conc. opn. of Chin, J.).)

### 3. Analysis.

Viewing the evidence in the light most favorable to the judgment, as we must, we again conclude defendant used the car key in a manner capable of causing and *likely to result* in great bodily injury. The evidence presented at trial demonstrated that, when the three employees of the dealership confronted defendant in the motel parking lot, defendant took the stolen car keys from his pocket and made a fist so that the "sharp" end of one of the keys stuck out from between his knuckles. Defendant then "charged," "came at," or "lunged" at Agustin. And, when he was within reach of Augustin, defendant "swung," "swiped," or "punch[ed]" at Agustin's torso "with force." True, defendant did not actually strike Agustin, and Chase (who was not the closest of the three men to defendant) believed defendant was too far away to contact Agustin. But the evidence presented at trial demonstrated it was only Arthur's intervention that prevented defendant from striking Agustin. Agustin testified he was not hit "because my nephew [i.e., Arthur] pulled me back," and Arthur testified, "If I didn't move [Agustin], he probably would have got hit."

We believe this case is similar to *People v. Simons* (1996) 42 Cal.App.4th 1100 (*Simons*), a case the Supreme Court cited with at least implicit approval in *B.M.* (See *B.M.*, *supra*, 6 Cal.5th at pp. 535, 538.) The defendant in *Simons* held several armed

16

police officers at bay with a screwdriver, an object the court described as "not an inherently deadly weapon." (*Simons*, at p. 1107.) Although instructed to drop the tool, the defendant flailed it about and urged the officers to shoot him. On those facts, the court found that for purposes of the crime of exhibiting a deadly weapon to prevent arrest (§ 417.8), "[t]he evidence clearly demonstrated that the screwdriver was capable of being used as a deadly weapon and that defendant intended to use it as such if the circumstances required." (*Simons*, at p. 1107.)

Like a screwdriver, a car key is not an inherently deadly weapon. But like the defendant in *Simons*, who used the screwdriver to keep police officers at bay, defendant swung the key to keep the three rental car company employees at bay. As with *Simons*, defendant did not actually strike Agustin so there were no resultant injuries. But, as the Supreme Court made clear in *B.M.*, we may consider the injuries that likely *would have* resulted from the way defendant actually used the key. (*B.M.*, *supra*, 6 Cal.5th at p. 535.) Whereas in *B.M.* the minor stabbed her sister on her legs, which were covered with a blanket, the defendant in *Simons* wildly and uncontrollably flailed the screwdriver at officers who were presumably clothed in standard police uniforms. (See *Simons*, *supra*, 42 Cal.App.4th at pp. 1105-1106.) Here, defendant "lunged," "charged," or "came at" Agustin and, "with force," "swung," "swiped," or "punch[ed]" the key at Agustin's *torso*, a much more vulnerable part of the body than an extremity, that was clothed in a polo shirt. And, but for Arthur pulling Agustin back, defendant would have struck Agustin. As the Supreme Court stated in *B.M.*, "an aggressor should not receive the benefit of a potential victim fortuitously . . . being removed from harm's way once an assault is

17

already underway." (*B.M.*, at p. 537.) From the way defendant wielded the key, we conclude there was more than a mere possibility Agustin would have suffered serious bodily injury if defendant had succeeded in striking him and, therefore, the evidence supports the conclusion defendant used the key in a manner that was both capable of producing and likely to produce serious bodily injury.[5] (*Id*. at pp. 534-535.)

This court has previously relied on *Simons* when concluding a not inherently deadly instrument was used as a deadly weapon. In *People v. Page* (2004) 123 Cal.App.4th 1466 (*Page*), another decision the Supreme Court in *B.M.* at least implicitly approved of (see *B.M.*, *supra*, 6 Cal.5th at p. 538), the defendant and his female accomplice robbed the victim and, after rifling the victim's pockets for his wallet, the female accomplice held a sharp pencil to the victim's neck and told him not to call the police. (*Page*, at pp. 1468-1469.) The defendant challenged his conviction for assault with a deadly weapon contending the pencil was not a deadly weapon. (*Id*. at p. 1470.)

Relying on *Simons* and similar cases, this court concluded the accomplice used the pencil in such a manner capable of producing serious bodily injury and, therefore, under the facts of that case the pencil was a deadly weapon as a matter of law. (*Id*. at pp. 1470-1473.) We rejected the suggestion that *Simons* was distinguishable simply because it did not address the aggravated assault statute. "'[N]o sound reason appears to define a "deadly weapon" for purposes of section 245 differently than it is defined in other

---

[5] We need not conclude it was more probable than not the manner in which defendant wielded the key at Agustin's torso would have resulted in serious injury. (*B.M.*, *supra*, 6 Cal.5th at pp. 539-540 (conc. opn. of Chin, J.).)

contexts under other statutes.' [Citations.] Cases discussing the definition of a deadly weapon routinely rely on other cases dealing with different statutes." (*Page*, at p. 1472.)

More recently, in *In re D.T.* (2015) 237 Cal.App.4th 693 (*D.T.*)—again, a case the Supreme Court at least implicitly approved of in *B.M.* (see *B.M.*, *supra*, 6 Cal.5th at pp. 536, 538)—the juvenile court found a minor committed an assault with a deadly weapon when he poked a classmate in the back with the sharp end of a pocketknife. The victim testified, "[t]he knife felt 'sharp' and 'pointy,' and [she] felt some pain. She did not think minor would hurt her, or that he was trying to cut or kill her. However, the victim was scared that an injury might occur because minor had a knife pressed to her back." (*D.T.* at p. 697.) The investigating officer testified similar knives can cause serious injury or death. (*Ibid.*)

On appeal, the minor in *D.T.*, *supra*, 237 Cal.App.4th 693, argued the knife was not likely to cause death or great bodily injury. Relying on our decision in *Page* and on *Simons*, we disagreed. "[I]n *Page* this court found a pencil, which is less sharp and less likely to cause serious harm than a knife, to be a deadly weapon when it was held against a victim's throat without any slicing or stabbing motions. (*People v. Page*, *supra*, 123 Cal.App.4th at p. 1472.) Even more supportive of our point is *People v. Simons* (1996) 42 Cal.App.4th 1100, 1106-1107 . . . , in which the court held that a screwdriver was a deadly weapon even though the defendant had only brandished it at police officers without actually touching anyone. If a pencil held to a victim's neck, *and a screwdriver that is only used to threaten from a distance*, are both likely to cause death or serious bodily injury, then so is a sharp knife held to the back of a victim. As we have explained,

the test is whether the knife was "'used in such a manner as to be *capable of producing* and *likely to produce*, death or great bodily injury." [Citation.]' (*Aguilar*, *supra*, 16 Cal.4th at pp. 1028-1029, italics added.) Because the knife was sharp, and because minor held it against the victim in such a way that a sudden distraction or misstep could have resulted in a serious puncture wound, the knife had the capacity to cause serious bodily injury or death. It therefore meets the *Aguilar* standard for likelihood." (*D.T.*, at pp. 700-701, first italics added, second italics in original.)

As in *Page* and *D.T.*, we continue to find *Simons* persuasive. If using a screwdriver to fend off police officers from a distance is likely to result in serious injury, then forcefully swinging, swiping, or punching a car key at a victim's torso from a short distance is also likely to result in serious injury.

B.      *The Trial Court Must Determine on Resentencing Whether to Impose Concurrent Sentences on Counts 1 and 3.*

Defendant contends, and we agree, the trial court inaccurately believed it could only sentence defendant on counts 1 and 3 concurrently with the sentence on count 2 if it first struck defendant's strike. We reverse the sentence and remand for the trial court to consider in the first instance whether concurrent sentences on counts 1 and 3 are appropriate.

At sentencing, defense counsel asked the trial court to sentence defendant to nine years on count 2 (the low term of two years, doubled under the one strike law, plus a five-year enhancement for the prior serious felony conviction). Counsel also requested the court consider imposing concurrent sentences for counts 1 and 3: "We would obviously

20

greatly appreciate it if the Court would run the time concurrent on the other two counts but, should the Court be inclined not to run that concurrent, that it run one-third the midterm for two years on Count 1." The court indicated its belief that, for the sentences on counts 1 and 3 to run concurrently with count 2, "I'd have to strike the strike for those counts." Counsel stated she was not asking the court to strike the strike. The court then stated, "I think it has to be consecutive unless I strike the strike. I can do that for those subsequent counts[, i.e., counts 1 and 3], impose it one time [on count 1] then strike it."

The trial court designated count 2 as the principal count, and sentenced defendant to the middle term of three years, doubled pursuant to the one strike law, for a term of six years in state prison. On count 1, the trial court sentenced defendant to one-third the middle term of three years. But rather than strike the strike conviction, the court doubled the term pursuant to the one strike law for a term of two years in state prison to run consecutively to count 2. Similarly, the trial court sentenced defendant to one-third the middle term of two years on count 3, doubled pursuant to the one strike law, for a term of one year four months in state prison to be served consecutively to count 2. Finally, the trial court imposed a five-year sentence enhancement for defendant's prior serious felony conviction, to be served consecutively to count 2, for a total term of 14 years four months in state prison.

"If there is a current conviction for more than one felony count *not committed on the same occasion, and not arising from the same set of operative facts*, the court *shall* sentence the defendant consecutively on each count . . . ." (§§ 667, subd. (c)(6), 1170.12, subd. (a)(6), italics added.) Under the plain language of the statutes, the trial court has no

21

discretion to sentence a defendant to concurrent sentences under the three strikes law when the current felony convictions were not committed on the same occasion or did not arise from the same operative facts. In that situation, consecutive sentences are mandatory. (*People v. Hojnowski* (2014) 228 Cal.App.4th 794, 800.) But the trial court has discretion to impose concurrent sentences if it concludes the current convictions were committed on the same occasion or did arise from the same operative facts (*People v. Casper* (2004) 33 Cal.4th 38, 42), unless a consecutive sentence is otherwise mandated by another statute (*People v. Torres* (2018) 23 Cal.App.5th 185, 198).

As noted, the trial court indicated it believed it could impose concurrent sentences on counts 1 and 3 only if it first struck defendant's strike conviction. The People contend the record does not affirmatively demonstrate the trial court misunderstood its limited discretion to impose concurrent sentences under the three strikes law, and the court's "vague statement" does not overcome the presumption the court understood its discretion. The trial court was not vague in the least. To repeat, when defense counsel asked for the court to impose consecutive sentences on counts 1 and 3, the court said, "*I'd have to strike the strike for those counts*." (Italics added.) The court also said, "I think it has to be consecutive *unless I strike the strike*. I can do that for those subsequent counts[, i.e., counts 1 and 3], impose it one time [on count 1] then strike it." (Italics added.) On this record, we are not persuaded the trial court understood it had discretion to impose concurrent sentences. "[W]hen the record indicates the court misunderstood or was unaware of the scope of its discretionary powers, we should remand to allow the court to properly exercise its discretion." (*People v. Bolian* (2014) 231 Cal.App.4th 1415, 1421.)

The People also argue that, if we conclude the trial court misunderstood its discretion, we should not remand for resentencing because there is no possibility the trial court will conclude the offenses were committed on the same occasion or did arise out of the same operative facts. According to the People, the record supports the trial court's implied findings that the current offenses were not all committed on the same occasion or did not arise from the same operative facts.

We might be inclined to apply the doctrine of implied findings but for the fact the trial court sentenced defendant under the clear misapprehension that striking a strike was the only way to impose a concurrent sentence, and there is no indication whatsoever the court implicitly concluded the crimes were not committed on the same occasion and did not arise from the same operative facts. Although we agree with the People that arguably defendant's offenses of robbery and resisting arrest were not committed on the same occasion and did not arise from the same set of operative facts, it is a much closer call with respect to his offenses of robbery and assault with a deadly weapon. Such a determination is much better left to the trial court in the first instance.

C. *Errors in the Minute Order from Sentencing and Abstract of Judgment.*

Defendant argues, and the People agree, there is an error in the minute order from the sentencing hearing regarding his prior felony admission. The People originally alleged defendant had suffered two prior felony convictions: a 2013 conviction for possession of a controlled substance and a 2011 strike conviction for attempted carjacking. At the sentencing hearing, however, the prosecution pursued only the prior conviction for carjacking after agreeing with defense counsel the drug conviction was

23

likely to be reduced to a misdemeanor under Proposition 47. Defendant then waived his right to a jury trial and admitted the attempted carjacking conviction. However, the minute order erroneously states, "Defendant admits Prior(s) 01 [and] 02," and "Court orders Prior(s) 02 Stricken."

Defendant also contends the minute order and abstract of judgment do not reflect the oral pronouncement of the restitution fine and parole revocation fine. Section 1202.4 mandates every defendant convicted of a felony pay a restitution fine of no less than $300 and no more than $10,000. (§ 1202.4, subd. (b)(1).) The court may, in its discretion, impose a restitution fine using the following formula: the minimum fine ($300), times the "number of years of imprisonment the defendant is ordered to serve," times "the number of felony counts of which the defendant is convicted." (*Id*., subd. (b)(2).) The court must also impose a parole revocation fine in the same amount as the restitution fine. (§ 1202.45, subd. (a).)

In its report and sentencing recommendation, the probation department recommended the trial court consider count 2 as the principal count and sentence defendant as follows: the middle term of three years on count 2, doubled under the one strike law should the prior strike be found true; one-third the middle term of three years on count 1, doubled if the court found true the strike allegation; and one-third the middle term of two years on count 3, again, doubled should the court find true the strike allegation. Therefore, the probation department recommended a total state prison sentence of four years eight months if the strike prior was not found true and a sentence of 15 years four months if it was found true (this included the five-year enhancement for

24

the strike prior, and a one-year enhancement for the prison prior defendant did not admit). Based on the minimum recommended prison sentence of four years eight months (assuming the strike prior was not found true), the probation department recommended the trial court impose restitution and parole revocation fines in the amount of $3,600 each, using the formula set forth in section 1202.4, subdivision (b)(1) (minimum fine ($300) x years in prison (4) x number of convictions (3) = $3,600).

With the exception of the one-year enhancement for the alleged prison prior, that defendant did not admit, the trial court followed the probation department's recommendation for sentencing. It did not, however, impose the recommended restitution and parole revocation fines. The court plainly stated on the record, "I shall impose a minimum restitution fine and other fines." Yet, the minutes from sentencing and the abstract of judgment both indicate defendant was ordered to pay a restitution fine of $3,600 and a parole revocation fine of $3,600. This was plainly in error. As noted, the minimum restitution and parole revocation fine is $300. (§§ 1202.4, subd. (b)(1), 1202.45, subd. (a).)

The People argue the minutes and abstract of judgment reflect the correct restitution and parole revocation fines as permitted by section 1202.4, subdivision (b)(2). But, the People's argument presupposes the trial court intended to impose a fine using that formula. Nothing supports that conclusion. The trial court said, clearly and unambiguously, it was imposing the "*minimum* restitution fine and other fines." (Italics added.) There is no wiggle room there.

25

Moreover, arithmetic is not on the People's side. The probation department recommended a restitution and parole revocation fine of $3,600 based on the assumption defendant's strike prior would not be found true, and defendant would only be sentenced to four years eight months. Had the trial court intended to impose restitution and parole revocation fines using the formula set forth in section 1202.4, subdivision (b)(2), the correct figure would have been $10,000 (minimum fine ($300) x years of imprisonment (14) x number of convictions (3) = $12,600, capped at the maximum fine of $10,000).

Because we reverse the sentence and remand for resentencing, we need not direct the minutes and abstract of judgment to be corrected. When defendant is resentenced, we presume the minutes will accurately reflect defendant only admitted one strike prior. The trial court is, of course, free at resentencing to impose a new restitution and parole revocation fine. Should the court once more impose the minimum fines, we presume the minutes of sentencing and abstract of judgment will so reflect.

V.

DISPOSITION

The sentence is reversed.  At resentencing, the trial court must consider whether concurrent sentences on counts 1 and 3 are appropriate pursuant to Penal Code sections 667, subdivision (c)(6), and 1170.12, subdivision (a)(6).

In all other respects, the judgment is affirmed.

CERTIFIED FOR PUBLICATION


McKINSTER_____
Acting P. J.

I concur:


MILLER_____
J.

27

[*People v. Koback*, E066674]

Slough, J., Dissenting.

I

INTRODUCTION

For the second time, my colleagues refuse to follow the clear direction of the California Supreme Court in determining whether a person has used an everyday object in a manner "likely to produce death or great bodily injury" such that they may be convicted of assault with a deadly weapon. (Pen. Code, § 245, subd. (a)(1); *People v. Aguilar* (1997) 16 Cal.4th 1023, 1029 (*Aguilar*).) Our Supreme Court vacated the majority's prior opinion after clarifying that standard in *In re B.M.* (2018) 6 Cal.5th 528 (*B.M.*). Undeterred, my colleagues reach the same result on remand, by distorting the trial record and misreading *B.M.* as holding death or serious injury is "likely" if there is "more than a mere possibility" of its occurrence. (Maj. opn. *ante*, at p. 18.) I dissent.

The issue we face is whether Brian Koback used a car key as a deadly weapon when he swung it once with unknown force at the victim's torso from a few feet away and missed. After the majority initially upheld Koback's conviction based on speculation about how a key could be used as a deadly weapon, our Supreme Court directed us to reconsider this question in light of *B.M.*, in which the Court reaffirmed the *Aguilar* standard and held: "[S]peculation without record support as to how the object could have been used or what injury might have been inflicted if the object had been used differently is not appropriate," rather "the determination of whether an object is a deadly weapon . . . must rest on evidence of how the defendant *actually* 'used' the object." (*B.M.*, *supra*, 6

1

Cal.5th at pp. 530, 534, italics added.)  Although the Court did not provide a precise definition of "likely," it did note the ordinary dictionary meaning of the word is "'having a high probability'" or "'very probable,'" and that it has been defined in other criminal contexts as having a "'probability [that is] great.'"  (*Id.* at pp. 533-534.)

I believe *B.M.* requires us to reverse Koback's conviction.  As in that case, the evidence of how Koback used the key is insufficient to support a conclusion that death or serious injury was likely to result "[u]nder any plausible interpretation of the term 'likely.'"  (*B.M.*, *supra*, 6 Cal.5th at p. 536.)  The key was not sharp and there's no evidence how hard he swung it, in part because he didn't make contact with the victim.

To avoid this outcome, the majority conclude "likely" means only "more than a mere possibility," and apply the standard in *People v. Simons* (1996) 42 Cal.App.4th 1100 (*Simons*)—a pre-*Aguilar* appellate court opinion involving the offense of *exhibiting a deadly weapon to evade arrest*.  Analogizing to the facts of *Simons*, the majority conclude there was "more than a mere possibility" the victim would have been seriously injured if the key had made contact with him, because Koback "swung the key to keep [him] . . . at bay," just like the defendant in *Simons* "who used [a] screwdriver to keep police officers at bay."  (Maj. opn. *ante*, at pp. 17-18.)  Because the crime of exhibiting a deadly weapon to evade arrest does not "turn[] on the nature of the force used" like the assault at issue here, *Simons* provides no support for the majority's holding.  (*Aguilar*, *supra*, 16 Cal.4th at p. 1035.)

But even if *Simons* were relevant to our issue, its facts aren't remotely analogous. The majority tries to sidestep that problem by manipulating the record to raise the specter

2

of danger.  They say the key was "sharp," but the only time that word appears in the trial transcript is when the prosecutor used it to distinguish the key's ignition end from its fob end.  Treating the prosecutor's use of the adjective in that context as evidence the key was sharp-edged and dangerous is an elementary error.  The majority also clip and paste together words from three different witnesses' descriptions of Koback's single swing to conjure a sense he acted "wildly or uncontrollably."  (*B.M.*, *supra*, 6 Cal.5th at p. 535.)  Thus, they say he "'lunged,' 'charged,' or 'came at'" the victim and, "'with force,' 'swung,' 'swiped,' or 'punch[ed]' the key at [his] *torso*."  (Maj. opn. *ante*, at p. 17.)  In fact, there was only a single swipe, which Koback delivered with unknown force before fleeing.  If the "moderate" force B.M. used to repeatedly stab her sister's legs with a butter knife is insufficient to constitute assault with a deadly weapon, swinging a key once with some unknown degree of force is too.  (*B.M.*, at p. 536.)

The more egregious error, though, is that the majority define "likely" as "more than a mere possibility."  (Maj. opn. *ante*, at p. 18.)  Possible means having more than a zero percent likelihood of occurring.  (See Webster's 9th New Collegiate Dict. (1991) p. 918 [defining "possible" as "being within the limits of . . . realization"].)  Thus, under today's holding, an event with an extremely low likelihood (say, two or three percent) would be *likely* simply because its probability of occurring is *more* than just possible.  In other words, so long as an occurrence is not *im*possible, it's likely.  One doesn't need a degree in statistics to know this is an incorrect definition of likely.  Indeed, defining likely in this way essentially turns *Aguilar's* likelihood standard into a question of whether the object is *capable* of causing serious injury, which promotes the very error

3

our Supreme Court identified in *B.M.*—upholding aggravated assault convictions based on speculation "as to how the object *could have* been used or what injury *might* have been inflicted if the object had been used differently." (*B.M..*, *supra*, 6 Cal.5th at p. 530, italics added.)

This error calls out for correction and underscores the fact that lower courts need guidance on the likelihood standard. The guidance is important. For Koback and others in his position, the likelihood standard determines not only whether they will be convicted of simple or aggravated assault, but also whether they'll have a strike offense on their record, with all the consequences that entails. (Pen. Code, §§ 667, 1192.7.) As I said in my previous dissent, it is critical we maintain the distinction between likelihood and possibility of serious injury, for a fool with a car key is much less dangerous (and culpable) than a fool with a dagger.

## II

## ANALYSIS

A.      *Assault with an Object Used as a Deadly Weapon (Aguilar)*

Penal Code section 245, subdivision (a)(1) (section 245(a)(1)) prohibits assaulting a person "with a deadly weapon or instrument other than a firearm." (Unlabeled statutory citations refer to the Penal Code.) In *Aguilar*, the Court articulated the standard for determining whether an object constitutes a deadly weapon for purposes of section 245(a)(1). "[A] 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.'" (*Aguilar*, *supra*, 16 Cal.4th at pp. 1028-1029.)

4

The first part of this standard, capability, focuses on the nature of the object (is it sharp, heavy, blunt?) and whether a person *could* cause serious injury with it. It's possible to imagine that some objects may not meet this first prong. It is probably impossible to gravely injure someone with a rice cake, whereas we can all imagine how a person could do serious damage with a butter knife or a golf club.

The second part of the test, likelihood, focuses on how the defendant *actually* used the object. This inquiry "turns on the nature of the force used." (*Aguilar*, *supra*, 16 Cal.4th at p. 1035) Objects that can "be grasped while throwing a punch, like rolls of coins, batteries, [] bicycle footrests," (or car keys), may "be deemed instruments of [aggravated] assault" only if there is "sufficient proof" the object was actually used "in a manner *likely to produce* death or great bodily injury." (*In re David V.* (2010) 48 Cal.4th 23, 30 & fn. 5, quoting *Aguilar*, at p. 1029, italics added.) The difference between the capability and likelihood standards is the difference between swinging a nine iron at someone's head or shoving them in the shoulder with it. The club is certainly capable of causing severe injury, but only in the former example is it also likely to cause severe injury *as used*.

"[A]ll aggravated assaults are ultimately determined based on the *force likely to be applied* against a person." (*Aguilar*, *supra*, 16 Cal.4th at p. 1035, italics added.) If, however, the object is an inherently dangerous weapon, we treat it as a deadly weapon as a matter of law, meaning its mere use in an assault is sufficient to violate section 245(a)(1). (*Aguilar*, at p. 1029 ["[s]ome few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are

5

designed establishes their character as such].)  Requiring a likelihood standard for everyday objects, however, makes sense.  We infer a likelihood of serious injury when people use inherently dangerous weapons in assaults because those weapons are specifically designed to inflict such injury.  (See *B.M.*, *supra*, 6 Cal.5th at p. 537 ["Where a defendant uses a firearm with poor aim, lack of injury carries little weight not because it is appropriate to consider what injury could have resulted if the defendant had had better aim, but because in many circumstances using a firearm even with poor aim is likely to produce death or serious injury"].)  But the same is not true for golf clubs, car keys, and other generally innocuous objects.  For these, we must look to the specifics to determine whether the defendant's actions were culpable enough to warrant the harsher punishment aggravated assault carries.

B.　　*Koback I and B.M.*

In their first decision, the majority ignored the likelihood standard and upheld Koback's conviction on the ground the car key was *capable* of producing serious injury (*Koback I*).  They concluded, "there is nothing in the record to suggest defendant would not have continued to swing the car key at [the victim] if he and the other men had not backed off, or that defendant would only have swung at [the victim's] torso and would not have swung for his face or neck."  (*Koback I*, at p. 10.)  As support, they cited the appellate court's decision in *B.M.*, which concluded B.M.'s use of a butter knife to attack her sister constituted assault with a deadly weapon because she "'could have easily inflicted great bodily injury with [the] . . . knife and just as easily [could] have committed mayhem upon the victim's face.'"  (*B.M.*, *supra*, 6 Cal.5th at p. 532.)

6

The California Supreme Court granted review of *Koback I* and the appellate court's decision in *B.M.* The Court then issued a decision in *B.M.*, in which it held that "speculation without record support as to how the object could have been used or what injury might have been inflicted if the object had been used differently is not appropriate." (*B.M.*, *supra*, 6 Cal.5th at p. 530.) The Court clarified, "the *Aguilar* standard does not permit conjecture as to how the object could have been used," rather "the inquiry focuses on 'the force *actually used*.'" (*Id.* at p. 534.)

The Court cited *People v. Beasley* (2003) 105 Cal.App.4th 1078 (*Beasley*) and *People v. Duke* (1985) 174 Cal.App.3d 296 (*Duke*) as instructive in applying *Aguilar's* likelihood standard. (*B.M.*, *supra*, 6 Cal.5th at p. 534.) In *Beasley*, the victim testified the defendant had used a broomstick to "beat [her] like he never [had] . . . before" and the prosecution submitted photographs of her bruised arms and shoulders to illustrate the extent of her injuries. (*Beasley*, at p. 1087.) The court found it "certainly conceivable" a broomstick "might be wielded in a manner capable of producing, and likely to produce, great bodily injury," but concluded the record was insufficient to support such a finding because the defendant had struck only non-vulnerable parts of the victim's body and, more importantly, her testimony "did not describe the *degree of force* [he had] used in hitting her with the stick." (*Ibid.*, italics added.) "The jury therefore had before it no facts from which it could assess the *severity* of the impact between the stick and [the victim's] body." (*Id.* at p. 1088, italics added.)

In *Duke*, the defendant held the victim in a headlock while he touched her breast. (*Duke*, *supra*, 174 Cal.App.3d at p. 302.) The victim said the headlock "made her feel

7

'choked' but did not cut off her breathing." (*Ibid*.) Although she said his hold felt "'firm,'" she did not say he tightened his grip. (*Ibid*.) The court found the victim's testimony insufficient to sustain a conviction for assault with force likely to cause great bodily injury, emphasizing that the inquiry focuses on "the force *actually used*," not "the force that . . . *could* have [been] used." (*Id*. at p. 303.) "[T]he fact that appellant could have easily broken [the victim's] neck or could have choked her to the point of cutting off her breathing by exerting greater pressure on her neck or windpipe will not support the conviction of felony assault. This would involve gross speculation on the part of the jury as to what the appellant would have done if he had not stopped of his own accord or had been stopped by outside forces." (*Ibid.*)

Approving the analyses in *Beasley* and *Duke*, the *B.M.* Court reaffirmed that "the determination of whether an object is a deadly weapon . . . must rest on evidence of how the defendant *actually 'used'* the object." (*B.M.*, *supra*, 6 Cal.5th at p. 534, italics added.) Turning to the evidence of B.M.'s assault, the Court recounted the victim's testimony that B.M. had stabbed and sliced her blanket-covered legs a few times using pressure that felt like "a five or a six" on a scale of 10. (*Id.* at p. 531.) The Court found this evidence insufficient to support the conviction for three reasons. First, the object itself was not particularly dangerous. The blade was metal, six inches long, and although it had ridges "on one edge of the blade," it "was not sharp" like a pocketknife. (*Id.* at p. 536.) Second, B.M. had attacked only the victim's legs. There was no evidence she "used or attempted to use the knife in the area of [the victim's] head, face, or neck, or on any exposed part of her body." (*Ibid.*) And third, B.M. had applied only "moderate

8

pressure" and had caused no injury.  (*Id.* at pp. 536-537.)  The Court concluded this evidence was insufficient to establish a likelihood of serious injury "[u]nder any plausible interpretation of the term 'likely.'"  (*Id.* at p. 536.)

The Court's conclusion made it unnecessary to define "likely" in the *Aguilar* context.  The Attorney General offered two definitions—that "likely to produce" serious injury means "essentially the same" thing as "capable of producing" serious injury, or that an object is "likely to produce" serious injury if its use in an assault "*increased the likelihood* of serious injury."  (*B.M.*, *supra*, 6 Cal.5th at pp. 533-534.)  The Court rejected these definitions, finding them "at odds with" the ordinary dictionary definition of "likely," which is "'having a high probability of occurring or being true'" or "'very probable,'" as well as the term's definition in other parts of the Penal Code (e.g., "likely" means having a "'probability [that is] great'" in the context of felony child abuse).  (*B.M.*, at p. 533, citing Merriam-Webster Collegiate Dict. (11th ed. 2014) p. 721 & § 273a.)  The Court refused to equate *Aguilar's* capability and likelihood standards, explaining "[t]he use of an object in a manner 'likely to produce' death or great bodily injury . . . requires more than a mere possibility that serious injury could have resulted from the way the object was used."  (*B.M.*, at p. 534.)

After issuing its opinion in *B.M.*, the Court vacated *Koback I* and remanded the case to us with directions to reconsider the assault conviction in light of its opinion.

C.     *Application of B.M. to this Case*

The analysis in *B.M.* focused on three questions—was the object sharp, where did defendant aim it, and with what degree of force?  (*B.M.*, *supra*, 6 Cal.5th at p. 536.)

9

Here, like the butter knife, the ignition end of the key that partially protruded from Koback's knuckles when he swung was not sharp.  This is the photograph of the key the prosecution showed the jury.



If anything, the key looks less sharp than the six-inch, ridged blade in *B.M.*  (*B.M.*, *supra*, 6 Cal.5th at p. 536.)  Certainly, the key's shaft comes nowhere near the sharpness of your average pocketknife, which *B.M.* references as a typical sharp object.  (*Ibid.*)

As to how Koback used the key, here is everything we know from trial.  The victim (Agustin) and his two coworkers testified Koback stood between three and five feet away from them when he made a fist around the plastic fob so part of the shaft protruded from his knuckles.  Agustin said Koback swiped once "with force" at his torso. One of the coworkers described the motion "Pretty much as if [Koback] was throwing a punch."  The swipe did not land—either because Koback was too far away or because

10

one of the coworkers pulled Agustin away in time. Agustin said Koback "got scared and he left" immediately after swinging at him.

This evidence is even less meaningful than the evidence in *B.M.*, *Beasley*, and *Duke*. In *B.M.* and *Duke*, the records *did* indicate how much force the defendants had used, but the courts found the evidence insufficient to support a finding that serious injury was likely. Our case is like *Beasley*, where there was no information about the degree of force used, except that in *Beasley* the defendant had actually inflicted injury. Here, the only evidence regarding force is Agustin's statement that Koback swung at him "with force." How much force? Enough to gravely injure Agustin if the key made contact with his clothed midsection? Enough only to scratch or graze him? The record doesn't provide an answer, and it's obvious that *some* force is not the same as force *likely to produce* death or great bodily injury. (*See B.M.*, *supra*, 6 Cal.5th at p. 536 ["moderate" force was insufficient to cause serious bodily injury].) Moreover, because Koback's conduct did not result in physical contact, we cannot infer the degree of force from evidence of the impact. (*B.M.*, at p. 537 ["nature" and "location" of injuries "are relevant facts for consideration in determining whether an object *was used* in a manner capable of producing *and likely to produce* great bodily injury"] italics added.)

This should be the end of our inquiry, but the majority bypass the on-point analyses in *B.M.*, *Beasley*, and *Duke*, and turn instead to *Simons*. (Maj. opn. *ante*, at pp. 17-18.) In *Simons*, the defendant thrashed a screwdriver at a group of police officers while ordering them to stay back and threatening to stab their dog. (*Simons*, *supra*, 42 Cal.App.4th at p. 1106.) Only after a physical struggle with defendant, during which the

11

officers threw a chair at him, were they able to disarm him of the screwdriver and arrest him. (*Ibid.*) On appeal, defendant challenged his section 417.8 conviction for exhibiting a deadly weapon to evade arrest on the ground that a screwdriver did not qualify as a deadly weapon under that statutory provision. The court rejected this argument and affirmed the conviction, concluding that a screwdriver was certainly capable of being a deadly weapon if used to stab and the evidence supported a finding he "intended" to stab the officers with the screwdriver "if the circumstances required." (*Simons*, at p. 1107.) The majority concludes this holding supports affirming Koback's conviction for *assault* with a deadly weapon because "like the defendant in *Simons*, who used the screwdriver to keep police officers at bay, [Koback] swung the key to keep the three rental car company employees at bay." (Maj. opn. *ante*, at p. 17.)

There are two problems with relying on *Simons*. First, our facts are not at all analogous. In *Simons*, the defendant engaged in a series of aggressive actions—thrashing the screwdriver at the officers, threatening to stab their dog, and wrestling with them. (*Simons*, *supra*, 42 Cal.App.4th at p. 1106.) In contrast, our record consists of a single action—swinging the short ignition end of a car key from a few feet away.

The only way the majority make their comparison to *Simons* is by misrepresenting the trial record. They string together multiple witness accounts describing Koback's single swing to make his wielding of the key seem aggressive and erratic, and they take the prosecutor's use of the word "sharp" to distinguish the key's fob end from the ignition end as evidence the shaft was sharp-edged. In addition, they attempt to evoke an aura of dangerousness around the incident by recounting the details of the employees'

12

first encounter with Koback in the Enterprise parking lot, noting how close he stood to them, how he told them he'd '"fuck' them up" if they didn't back off, and how he seemed to be getting "angry" and agitated. (Maj. opn. *ante*, at p. 5.) But these facts do not matter to the issue actually in dispute—whether he swung the key with force likely to produce serious injury during the second, later encounter in the motel parking lot. Koback's actions during the first encounter may provide circumstantial evidence of his state of mind during the second, but his state of mind is not in dispute. It is uncontested he *intended* to assault Agustin. The issue is whether that assault was simple or aggravated, based on how he used the key.

What I find more significant than the detail the majority recount is Agustin's testimony Koback "got scared" after swiping at him and immediately fled. That testimony suggests he was *not* trying to seriously injure Agustin by swiping at him but rather trying only to gain distance from his pursuers—like he had a few minutes earlier in the Enterprise parking lot by threatening to "fuck [them] up" if they didn't back away. Notably, Koback also fled during that first encounter.

The second, and more fundamental, problem with relying on *Simons* is that case doesn't apply the relevant test—whether an assault with an everyday object involved force *likely to produce* serious injury. This is because *Simons* deals with section 417.8 and what matters for that offense is the defendant's *intent*—that is, whether they brandished a dangerous object at a police officer *for the purpose of* evading arrest. (*Simons*, *supra*, 42 Cal.App.4th at p. 1106.) Section 417.8 is concerned with protecting police officers from injury when making arrests and, as a result, punishes those who

13

exhibit a dangerous object during an arrest and are *willing* to use it as such, if need be. Aggravated assaults, by contrast, depend entirely on the type of force used, irrelevant of the defendant's intent. (*B.M.*, *supra*, 6 Cal.5th p. 534.) *Simons* therefore has no bearing on our analysis—the test we must apply is the one in *Aguilar*, *B.M.*, *Beasley*, and *Duke*.[1]

The majority justify their reliance on *Simons* by arguing the *B.M.* Court "cited [it] with at least implicit approval." (Maj. opn. *ante*, at p. 16.) In fact, the Court cited *Simons* to distinguish it, because the Attorney General relied on the case as grounds for affirming B.M.'s conviction. (*B.M.*, *supra*, 6 Cal.5th at p. 538 [rejecting *Simons* as a basis for upholding B.M.'s conviction].) *Simons* does *not* appear in the relevant portion of *B.M.*, where the Court reaffirms and clarifies the *Aguilar* standard. The cases cited there are *Beasley* and *Duke*.

The majority also point out that a different panel of this court relied on *Simons* to uphold an assault with a deadly weapon conviction in *People v. Page* (2004) 123 Cal.App.4th 1466 (*Page*). The *Page* court concluded the defendant committed assault with a deadly weapon when she held the sharpened tip of a pencil to the victim's neck during a robbery and told him not to involve the police because she "knew where he lived." (*Id.*, at p. 1469.) Like the majority does here, the *Page* court cited the *Aguilar* force-likely test, but then applied *Simons*, affirming the conviction because a sharpened

---

**1** Although *Duke* involved assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)) rather than assault with a deadly weapon, its analysis is relevant because "the jury's decisionmaking process in [both cases] . . . is functionally identical"—"in either instance, the decision turns on the nature of the force used." (*B.M.*, *supra*, 6 Cal.5th at p. 535.)

pencil *could* be dangerous and the defendant's use of one while threatening the victim during a robbery demonstrated she *intended* to use it as a weapon *if need be*. (*Page*, at p. 1473.) For the reasons just explained, *Page* should not have relied on *Simons*, but at least in that case the error was harmless. Had the court applied the *Aguilar* test instead, it could have properly concluded, like the court did in *In re D.T.* (2015) 237 Cal.App.4th 693, that "a sudden distraction or misstep" likely would have "resulted in a serious puncture wound" to the victim's neck. (*Id.* at p. 701.) In other words, it would have been reasonable for *Page* to conclude that serious injury is likely when one holds a sharp object to a vulnerable part of the body during a tense encounter like a robbery, where things can take a wrong turn at any given moment. Here, in contrast, we cannot say with any confidence that Koback's swing threatened a similar risk of injury.

What our case boils down to is a single swipe of a car key at a person's clothed midsection from a few feet away with unknown force. No other court has upheld an aggravated assault conviction on such thin evidence. A survey of the published cases where everyday items were found to have been used *in a manner likely to* kill or severely injure is illustrative of what an aberration this case is. In *People v. Russell* (1943) 59 Cal.App.2d 660, the defendant used a fingernail file to slash the victim's face, causing a large gash requiring 11 stitches. In *People v. White* (1963) 212 Cal.App.2d 464, the defendant bashed the victim's head with a rock, causing a two-inch gouge that penetrated "through all layers of the scalp . . . to the bone." (*Id.* at p. 465.) In *People v. Helms* (1966) 242 Cal.App.2d 476, the defendant smothered the victim's face with a pillow "for several minutes." (*Id.* at p. 478.) In *People v. Richardson* (1959) 176 Cal.App.2d 238,

15

the defendant repeatedly slashed the victim's face and head with a razor blade, causing cuts that required 25 to 30 sutures.  In *People v. Lee* (1937) 23 Cal.App.2d 168, the defendant hit the victim "several times over the head" with a pipe.  (*Id.* at p. 169.)

I realize comparison to cases with stronger facts can be of limited value in a substantial evidence review, however I believe these cases demonstrate what constitutes sufficient evidence of force in cases of aggravated assault *with everyday objects*.  In each, the object was actually used in a manner likely to produce great bodily injury.  And in most, the victims sustained injuries.  Given Koback swung once at Agustin's clothed torso from a few feet away, he would have had to use quite a great deal of force to seriously injure Agustin with the short portion of the ignition end that protruded from his knuckles.  The trial testimony is simply insufficient to show he did (or even *could*) swing with such force.

I have found only one aggravated assault case where the everyday item held to have been used as a deadly weapon *never made contact with the victim*, and that case is easily distinguishable.  In *In re Jose R.* (1982) 137 Cal.App.3d 269, the defendant stuck a metal pin inside an apple and gave it to his teacher, but fortunately another student warned the teacher before she could eat it.  (*Id.* at p. 274.)  At trial, a medical expert testified about the severe injuries and infections that could have resulted from ingesting that particular pin.  She also opined ingestion could have been fatal.  (*Id.* at p. 276.)  Based on that evidence, the court held the defendant had used the pin as a deadly weapon because, had the teacher ingested it as planned, she would have suffered grave injury.  (*Ibid.*)  Here, in contrast, the record contains no testimony about what could have

16

happened had Koback's swing landed.  Unlike ingesting a metal pin, which is sharp enough to draw blood upon slight contact, the type of the injury, if any, that would result from being hit in the midsection with a key like the one Koback used depends *entirely* on the force behind the swing.

The majority compound their error in relying on *Simons* by defining "likely" under *Aguilar* as "more than a mere possibility."  (Maj. opn. *ante*, p. 18.)  To justify this conclusion, they cite *B.M.'s* statement that "[t]he use of an object in a manner 'likely to produce' death or great bodily injury . . . requires more than a mere possibility that serious injury could have resulted from the way the object was used."  (*B.M.*, *supra*, 6 Cal.5th at p. 534.)  This conflates what is *necessary* to satisfy the likelihood standard with what is *sufficient* to do so.  When the Court said *Aguilar* requires "more than a mere possibility," it was not articulating a definition of likely, it was rejecting the Attorney General's proposed definition.  (*B.M.*, at p. 534 [rejecting argument that "likely" means merely "possible"]; see also *id.* at p. 535 ["a mere possibility of serious injury is not enough"].)  In other words, saying a mere possibility is not enough does not tell us how much *is* enough.  As Justice Chin pointed out in his concurrence, the Court *has not* defined "likely" under *Aguilar*.  (*B.M.*, at p. 540 (conc. opn. of Chin J.).)  But the Court has not left us completely in the dark as to the term's meaning.  In rejecting the idea that likely means possible, *B.M.* cites three other definitions of the word—"'very probable,'" "'having a high probability,'" and having a "'great'" probability.  (*B.M.*, at pp. 533-534.)  The fact that all of these convey a degree of probability much higher than the majority's definition is strong indication they have misread *B.M.*

III

CONCLUSION

Today's holding eviscerates *Aguilar's* likelihood standard and ignores the Court's

direction in *B.M.*  The result is that a person who committed simple assault is being

punished for assault with a deadly weapon.  I would reverse Koback's conviction to the

lesser included offense supported by the evidence.  (*Beasley*, *supra*, 105 Cal.App.4th at

p. 1088.)


SLOUGH
                            J.